IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RALPH DAVID PRIEST,

    Plaintiff,

vs.

    Case No. C2-04-186
    Judge Edmund A. Sargus, Jr.
    Magistrate Judge Norah McCann King

CITY OF HEATH, OHIO,
    et al.,

    Defendants.

## OPINION AND ORDER

This matter is before the Court on the Cross-Motions for Summary Judgment filed by Plaintiff, Ralph David Priest, and the separate Motions of Defendants, Patrolman Dale Queen and Trooper Charles Spurgeon. For the reasons that follow, Plaintiff's Motion is denied; Queen's Motion is denied; and Spurgeon's Motion is denied.

I.

A. **Statement of Facts**

On October 25, 2003, the Heath (Ohio) Police Department conducted a joint operation DUI Sobriety Checkpoint from 9:00 P.M. to 1:30 A.M. Several police agencies participated in the Checkpoint, including the City of Heath Police Department, the City of Newark Police Department, the Licking County Sheriff's Office, and the Ohio State Highway Patrol ("OSHP"). Defendant Dale Queen ("Queen") participated in the Checkpoint in his capacity as a Newark police patrol officer on special duty. Defendant Charles Spurgeon ("Spurgeon") participated in the Checkpoint in his capacity as a sergeant with the OSHP.

The Checkpoint was located on State Route 79 in Licking County, Ohio. The Checkpoint was arranged so that cones funneled southbound traffic on Route 79 into one lane. If the police diverted any vehicles out of the single lane, the drivers were directed to a parking lot off Route 79. A large tent had been erected in the parking lot to serve as a place for questioning and testing of diverted drivers.

That evening, at approximately 9:00 P.M., Plaintiff Ralph David Priest ("Priest"), a retired machinist from Rockwell Corporation, and a friend had dinner at a restaurant in Newark. Priest recalls that he had only one beer with dinner. (See Priest Dep., at 41.) Priest and his friend departed the restaurant approximately one hour later and drove to the friend's residence about a quarter mile away. The two sat in the vehicle Priest was driving and talked for a few minutes before Priest left to return to his home at approximately 10:30 P.M.

Priest's route of travel to his home took him on Route 79 in Licking County. Priest saw traffic backing up on this route and recalls seeing a sign indicating a DUI / Sobriety Checkpoint was in progress. Officer Queen was one of the "line officers" at the Checkpoint. As a line officer, Queen was responsible for making contact with every driver of a car that stopped in front of him. Every vehicle was stopped that drove through the Checkpoint. Queen would speak to a driver, have them produce their driver's license and proof of insurance, and question them. If Queen determined that any driver showed sings of impairment, that car was then ordered into the "diversion area" in the parking lot next to the Checkpoint.

Queen was the line officer who stopped Priest at the Checkpoint. Queen agreed that he did not observe Priest driving in any improper, unusual or suspicious manner. Priest approached and entered the line of cars in a safe and normal way. (Queen Dep., at 43.) Queen asked to see Priest's

licence and proof of insurance. Queen observed that Priest's eyes were bloodshot, glossy and watery. (Queen Dep., at 24.) Queen testified that he asked Priest questions while Priest was retrieving his license and insurance card and noted that Priest was showing some difficulty in performing simultaneously the two tasks of answering questions and obtaining the materials. (Queen Dep., at 25.) Moreover, Queen noticed that Priest's speech was "slightly impaired and slurred." (Queen Dep., at 27.) Queen asked Priest if he had been drinking. Priest responded that he had one beer at the restaurant during dinner. Queen looked around the inside of Mr. Priest's vehicle but did not see any empty alcohol containers in the car, or any other evidence of drinking. Priest was at all times cooperative and respectful.

Queen asked Priest to exit his car; Priest complied. Queen contends that several factors combined to give him a reasonable suspicion to ask Priest to step out of the vehicle and perform field sobriety tests, including (1) Priest admitted he had an alcoholic beverage; (2) Priest's eyes were bloodshot, glossy and watery; (3) Priest failed to perform two tasks at once; and (4) Priest slurred his speech. Priest was not under formal arrest at this time; Queen had, however, detained him in order to administer field sobriety tests.

Priest indicated that he and Queen left Priest's vehicle on the side of the road and walked to the large tent in the diversion area in the parking lot. Queen asked Priest if he had anything wrong with his hips, knees, or feet, because Priest was staggering and had a slightly noticeable limp as he walked. Priest stated he had arthritis in his hips. Queen and Priest proceeded to the parking lot, outside of the tent.

Queen testified that he always demonstrates the field sobriety tests so that the driver who is going to perform the test has a visual idea of what the test entails. (Queen Dep., at 47.) Queen testified that he explained and demonstrated the toe-to-heel walk sobriety test to Priest and asked Priest if he understood how to perform it. Priest lost his balance on five of the nine steps. Priest contends that his poor performance on the tests resulted from his physical problems and arthritis of the hips. Queen also testified that he also made observations regarding Priest's mental capacity to understand directions and part of his overall assessment of whether Priest was impaired. For instance, Queen observed that Priest failed to count each of the steps he took out loud, as directed by Queen, and had to stop during the test to ask when he was to turn around. Queen took these mental failures and inability to remember basic instructions as indicators that Priest might be impaired. (Queen Dep., at 48.)

Priest also performed the one-leg stand. This test requires a subject to stand balanced on one leg, with the other leg elevated a specific distance from the ground, for a count of one through thirty. Priest was only able to remain balanced on one leg for only a count of two before losing his balance. He attempted the test again and lost his balance for a count of one and then gave up. Priest maintains that these two tests were patently unreliable on persons with leg disabilities.

Queen also gave the Plaintiff a third field sobriety test, the horizontal gaze nystagmus test ("HGN"). Queen was trained and certified to perform the HGN test and has given the HGN test many times. Of the six possible clues, or signs of intoxication, Priest showed none. Queen was dissatisfied with the results of the test because, having observed many of what he considered to be classic signs of impairment, he was convinced that Priest was impaired. (Queen Dep., at 61.) Queen indicated that he asked another officer, Sergeant Spurgeon, to do an additional HGN test in good

lighting inside the tent in order to fully investigate Priest. (Queen Dep., at 61.)

Spurgeon had not seen Priest in or near his vehicle or in the parking lot. (Spurgeon Dep., at 24.) After Spurgeon entered the tent, Queen asked Spurgeon him to perform an HGN test on Priest. Queen advised Spurgeon that Priest had already been tested, and had shown no signs of intoxication. Spurgeon agreed to give Priest a second HGN test and approached Priest who was then sitting inside the tent. (Spurgeon Dep, at 40-41.) Plaintiff contends that Spurgeon actually performed two HGN tests of his own, and did not disclose the results of either to him. (Plfs' Aff., ¶ 7.) Upon performing the second HGN test, Spurgeon observed six out of six clues of intoxication on the HGN, which is indicative of impairment. (Spurgeon Aff. ¶ 13).[1]

While talking with Priest, Spurgeon noticed that Priest had a moderate odor of alcohol on his breath, his speech was slow and slurred, and he did not enunciate his words very clearly. (Spurgeon Dep, at 18, 28, 29, 51, 53, 60, 61; Spurgeon Aff. ¶ 12.) Spurgeon also observed Priest had red, glassy, bloodshot eyes and was unsteady on his feet. (Spurgeon Dep., at 24, 25, 28, 54, 55; Spurgeon Aff. ¶ 12.)

Plaintiff submitted an affidavit in which he states that during his encounters with the police officers in this case he "never slurred my speech or spoke in any unusual or abnormal manner at all. Furthermore, my eyes were not abnormally watery or bloodshot . . . . I was not 'unable to perform

---

[1] Plaintiff questions the propriety of the police officers administering multiple HGN tests and argues that the first was obviously correct because, at set forth more fully below, Plaintiff's subsequent blood alcohol test yielded a result of .003. Plaintiff argues that because he was taken directly from the scene, given a blood alcohol concentration-machine examination which resulted in a barely detectable reading of alcohol, Spurgeon's HGN test could not have been accurate because Priest had no significant alcohol in his system and therefore could not possibly have shown all six signs of alcohol intoxication. These arguments, however, go to the reliability of the evidence and credibility of the witnesses, which this Court may not assess on summary judgment motions.

two simple tasks at the same time.'" (Plf's Aff., ¶ 4-5.)

At the conclusion of the second HGN test, Priest asked whether he was under arrest and Spurgeon confirmed that he was. (Priest Dep., at 69-70; Spurgeon Aff. ¶ 15). Priest became upset, more expressive, raised his voice, used hand gestures and started to became irate.[2] Priest argued that he could not be arrested for having one beer. Spurgeon hand-cuffed Priest and took him to a Heath police cruiser for transport.

Priest was driven to the Heath Police Department for processing. Officer Chad Hunt of the Newark Police Department transported Priest to the police station and administered Priest's breath alcohol concentration ("BAC") test. Queen accompanied them to the police station and observed Hunt administering the test. Priest's BAC test results were .003, well below the legal limit of impairment in Ohio of .08. See Ohio Rev. Code § 4511.19 (codifying legal limit of alcohol concentration at eight-hundredths of one gram per ten liters of the person's breath, or .08) (Plf's Exh. 1, at pp. 9, 10.) Queen's name appears as the arresting officer on the BC test data report. Officer Hunt filled out and signed Priest's citation as "charging law enforcement officer." At the request of Officer Hunt and the sergeant at the Heath police department, Officer Queen signed the citation above Hunt's signature. (Queen Dep., at 31.) The citation indicates that Priest was "under the influence of alcohol/drug of abuse; prohibited blood alcohol concentration .003 BAC, Breath." (Plf's Exh. 1, at pp. 9, 10.)

---

[2] Plaintiff argues that Spurgeon arrested him in retaliation for was protesting his arrest and engaging in protected speech. These arguments, however, again, go to Plaintiff's interpretation of the facts and invite the Court to speculate and make credibility determinations, which the Court declines to do at this procedural juncture.

Queen testified that, when he took Priest to the police station, he believed that Priest was impaired by alcohol, but after his BAC test results revealed trace amounts of alcohol, he changed his view to believe that Priest was impaired by prescription or illegal drugs, or a combination of drugs and alcohol. (Queen Dep., at 13-14, 53.)

After the paperwork had been completed pertaining to the arrest, Priest was offered a ride to his residence. Priest refused this offer and chose instead to walk home, a distance of three to four miles.

Priest was prosecuted for driving under the influence of alcohol in Licking County Municipal Court. He pled not guilty, and filed a motion to dismiss the charges. (Plf's Exh. 6.) The prosecution ultimately dismissed all charges.

**B.     Procedural History**

Plaintiff filed his Complaint on March 5, 2004, against several Defendants, including the City of Heath, the City of Newark, Officer Hunt, Officer Queen and Patrol Sergeant Spurgeon. Plaintiff has dismissed Defendants City of Heath, City of Newark and Officer Hunt. Plaintiff's remaining claims arise under 42 U.S.C. § 1983 against Defendants Queen and Spurgeon in their individual capacities. Plaintiff claims that the acts of Defendants violated his right to be free from unreasonable searches and seizures as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution. (Comp. ¶ 18).

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to

be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, the Court will "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party. *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)(citing *John v. State of La. (Bd. of Tr. for State Coll. & Univ.)*, 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248. The Court will consider each party's motion separately, determining, for each side, whether a judgment may be entered in accordance with the standards of Rule 56 standard. Both motions must be denied if the court finds that there is a genuine issue of material fact. If, however, there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the Court will render judgment.

## III.

Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Section 1983 itself creates no substantive rights, but merely provides a mechanism for aggrieved persons to obtain a remedy for deprivations of rights established elsewhere. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992).

Defendants do not contest the fact that they were acting under color of law at the time of the incidents giving rise to Plaintiff's Section 1983 claim. Defendants assert that Plaintiff cannot establish that he has been deprived of a constitutional right. Defendant Spurgeon also contends that he is entitled to qualified immunity.

The stopping of an individual at a law enforcement checkpoint constitutes a "seizure" within the meaning of the Fourth Amendment. *United States v. Martinez*, 428 U.S. 543 (1976); see *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000). A brief delay at a sobriety checkpoint focusing solely on the issue of the driver's apparent sobriety, however, does not offend the Fourth Amendment. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 455 (1990). In *Sitz*, the Supreme Court held in particular that "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of

-10-

intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program. We therefore hold that it is consistent with the Fourth Amendment." *Id.*

A.  **Unreasonable Detention Following Investigative Checkpoint Stop**

Here, Priest does not claim any impropriety with respect to the Checkpoint that took place on the evening of October 25, 2003. Priest instead maintains that the police had no reasonable suspicion to continue with the detention to conduct more extensive sobriety testing. Neither the Supreme Court nor the Court of Appeals for the Sixth Circuit has directly addressed the level of suspicion required for the continued detention of a lawfully stopped driver at a sobriety checkpoint. The parties operate under the assumption that the "reasonable and articulable suspicion test" first set out in *Terry v. Ohio*, 392 U.S. 1 (1968), should be used to analyze whether a driver's continued detention is justified after a lawful checkpoint stop. This standard is one of individualized reasonable suspicion. *Id.*

Queen contends that it was reasonable to ask Priest to perform the field sobriety tests because he reasonably had articulable suspicion that Priest was operating his a vehicle while under the influence of alcohol. Queen maintains that he observed Priest's eyes as being watery and bloodshot; that Priest's speech was slurred; and that he could not perform two tasks at once. Plaintiff, however, specifically contradicts each of these assertions in his affidavit.

If a jury credits Queen's account and finds him more credible than Priest on the issue of whether Priest's eyes were red and watery, and that he could not perform simple tasks simultaneously and that his speech was slurred, the continued detention after the Checkpoint would be justified as such facts articulate reasonable suspicion that Priest was driving under the influence

in violation of Ohio Rev. Code § 4511.19.[3] By contrast, if a jury credited Priest's account, the jury could conclude that Officer Queen lacked reasonable suspicion to ask Priest to perform the field sobriety tests. The parties' conflicting contentions about Priest's conduct and appearance that night, and thus what Defendant's factual basis was for his actions make summary judgment inappropriate on this claim.

**B.      Arrest and Seizure by Spurgeon**

Summary judgment for or against Defendant Spurgeon is equally inappropriate. Spurgeon actually effectuated the arrest of Plaintiff. Plaintiff contends that he was arrested without probable cause, in violation of the Fourth Amendment to the Untied States Constitution.

The Fourth Amend provides guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. An arrest without probable cause violates the Fourth Amendment. *Klein v. Long*, 275 F.3d 544, 549 (6th Cir. 2001). Officer Spurgeon had probable cause to arrest Priest if "the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient

---

[3]      Ohio Rev. Code § 4511.19 provides in pertinent part:

(A)(1)   No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:

    (a)     The person is under the influence of alcohol, a drug of abuse, or a combination of them.

    \* \* \* \*

    (d)     The person has a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of the person's breath.

to warrant a prudent man in believing that [Priest] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 394, (1989)), and thus "probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000). The question of probable cause, therefore, is a factually intensive one. Thus, "'in general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.'" *Klein*, 275 F.3d at 550 (quoting *Gardenhire*, 205 F.3d at 315).

Fact questions preclude the Court from holding as a matter of law that Spurgeon had probable cause to make the arrest. Spurgeon maintains that the seizure was proper based on the physiological factors that Priest exhibited, including the HGN test. In addition to his observation that Priest's eyes were bloodshot and speech was slurred, Spurgeon contends that Priest had a moderate odor of alcohol about him. Yet, Officer Queen informed Spurgeon that, when Queen performed the HGN test, Priest exhibited none of the clues that could possibly substantiate a finding of impairment. Priest also contends that Spurgeon conducted the HGN test twice on him, but did not inform Priest of the results of his initial analysis. These divergent test results creates some question regarding the reliability of Spurgeon's ultimate conclusion that Priest failed six out of six indicators of alcohol impairment. Moreover, the fact that the later-administered BAC test revealed virtually no alcohol in Priest's breath casts some doubt on the Spurgeon's interpretation of Priest's HGN tests.

Nor have defendants demonstrated their entitlement to qualified immunity at this stage on plaintiff's unreasonable arrest claim. A defendant in a Section 1983 action may raise the affirmative defense of qualified immunity, which "shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982). The Court must permit the case to go to a jury if there are genuine issues of material fact as to whether Spurgeon violated Priest's Fourth Amendment rights in an objectively unreasonable way and, second, those rights were clearly established at the time of Priest's arrest such that a reasonable officer would have known that his conduct violated them.

The Court has determined that genuine issues of material fact remain on the issue of probable case as it relates to whether Spurgeon violated Priest's constitutional rights under the Fourth Amendment. It is clearly established that officers must have probable cause to make an arrest. *Klein*, 275 F.3d at 550. If Spurgeon's allegations are found to be not true, he had no basis for concluding that Priest had been driving under the influence of alcohol. An arrest under these circumstances would have been objectively unreasonable and in violation of a clearly established Fourth Amendment right. Consequently, this claim must survive summary judgment. *See, e.g., Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005); *St. John v. Hickey*, 411 F.3d 762, 770-71 (6th Cir. 2005).

**C.     Continued Arrest and DUI Charges**

Priest does not dispute that he told Queen upon being stopped that he had recently consumed beer. Priest does contradict any assertion that his eyes were glassy and bloodshot or that his speech

was slightly slurred. Priest objects to Queen's interpretation of the results of field sobriety tests, insofar as Priest contends that was unable to perform two of the field sobriety tests because of his physical disabilities. If a jury credits Priest's assertion he had explained to Queen his physical impairment prevented him from performing the first and second tests, and that he passed the first field sobriety eye test, a jury could find lack of probable cause.

Moreover, the Court concludes that the genuine issues of material fact remain as to Queen's role in the ultimate arrest and citation of Priest for driving under the influence. Queen insists that he had nothing to do with the fact that Officer Hunt charged Priest with operating a motor vehicle while impaired, and that he only signed the citation at the request of the Heath Police Department. Queen maintains that Officer Hunt mistakenly completed the BAC DataMaster Form and incorrectly listed Queen as the arresting officer. Resolution of these issues will affect the outcome of this lawsuit and the evidence is such that a reasonable jury could return a verdict in favor of either party.

## IV.

Consistent with the foregoing, Plaintiff's Motion for Partial Summary Judgment (Doc. #17) is **DENIED**; Defendant Charles Spurgeon's Motion for Summary Judgment (Doc. #18) is **DENIED**. Defendant Dale Queen's Motion for Summary Judgment (Doc. # 21) is **DENIED**. The Clerk is directed to issue an Order Setting Trial Date and Settlement Conference establishing dates for final resolution of this case as soon as practicable.

**IT IS SO ORDERED.**

3-27-2006
**DATED**

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE